UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GENIUS GROUP LIMITED,<br><br>                    Plaintiff,<br><br>        v.<br><br>ALTO OPPORTUNITY MASTER FUND, SPC – SEGREGATED MASTER PORTFOLIO B; AYRTON CAPITAL, LLC; and WAQAS KHATRI,<br><br>                    Defendants. | Civ. No. _____<br><br>**COMPLAINT** |

Genius Group Limited ("Genius"), by and through its undersigned attorneys, as and for its Complaint against defendant Alto Opportunity Master Fund, SPC – Segregated Master Portfolio B ("Alto"), Ayrton Capital, LLC ("Ayrton"), and Waqas Khatri ("Khatri") alleges as follows:

## NATURE OF THE CASE

1. This action arises from a toxic convertible note, scheme, and course of business that led to defendants gaining access to more than 50 million newly-issued shares of plaintiff's common stock,[1] at a steep discount from the prevailing market price. This scheme was perpetrated with an eye toward distributing those shares into the public markets for a profit based on the spread between the market price and the discounted acquisition price (as opposed to holding the shares for appreciation) without registering as dealers as required by Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)]. By failing to comply with the dealer registration requirements of the federal securities laws, defendants avoided certain regulatory obligations for

---

[1] Genius is publicly traded on the NYSE American stock exchange under the symbol GNS. Prior to entering into the arrangement at issue here, Genius had authorized over 24 million shares of stock. The transaction arrangement with defendants has resulted in Genius being required to issue as many as 60 million new shares, with an enormous dilutive effect on the equity of existing shareholders.

dealers that govern their conduct in the marketplace, including regulatory inspections and oversight, following financial responsibility rules, and maintaining books and records.

2. Moreover, defendants have structured their stock conversion transactions with Genius in a manner that it specifically intended to avoid mandatory reporting requirements under Sections 13 and 16 of the Exchange Act and Regulations 13D and 13G. By keeping the mechanics of this scheme and the effect of increasing the number of registered shares of plaintiff's stock shielded from the public, defendants are also unlawfully trading on inside, material, non-public information in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendant Khatri is subject to liability for defendants' violations as a control person pursuant to Section 20 of the Exchange Act.

3. Defendants' unlawful scheme depends for its very existence on certain agreements with plaintiff, pursuant to which defendant Alto acquired convertible debt securities that – if exercised in the manner intended by defendants – would allow Alto to obtain and distribute over 50 million newly-issued, discounted shares of plaintiff's stock without any disclosure of that fact to the public. Indeed, defendants expressly instructed Genius not to disclose the material effects that Alto's conversions would have upon the market. When these shares are distributed, defendants will receive over $200 million of return on an investment of $17 million.

4. The agreements between plaintiff and defendants are part and parcel of defendants' unlawful scheme, in violation of Sections 10(b), 13, 15, and 16 of the Exchange Act and Rule 10b-5, and should be declared void and rescinded pursuant to Section 29(b) of the Exchange Act [15 U.S.C. § 78cc(b)].

**THE PARTIES**

5. Plaintiff Genius Group Limited is a public limited company organized under the laws of the Republic of Singapore, with a principal place of business at 8 Amoy Street, #01-01, Singapore 049950. Shares of Genius are listed on the NYSE American stock exchange under the symbol "GNS."

6. Defendant Alto Opportunity Master Fund, SPC – Segregated Master Portfolio B is, upon information and belief, a private hedge fund registered in the Cayman Islands and is operated by defendant Ayrton Capital LLC.

7. Defendant Ayrton Capital, LLC is, upon information and belief, a limited liability company organized under the laws of the State of Delaware, with a principal place of business at 55 Post Road W, 2nd Floor, Westport, Connecticut 06880, and manages defendant Alto and its investments.

8. Defendant Waqas Khatri is, upon information and belief, a natural person and resident of the State of Connecticut, and is the managing member of defendant Ayrton and a director of defendant Alto. As the manager of the defendants and their representative who negotiated, approved, and executed the unlawful agreements with Genius, Khatri is a control person with respect to Alto and Ayrton's violations of the securities laws.

**JURISDICTION AND VENUE**

9. The Court has original jurisdiction to hear this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

10. The Court also has original jurisdiction to hear this action pursuant to 15 U.S.C. § 78aa.

11. The Court has original jurisdiction to hear this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000 and there is complete diversity of citizenship among the parties.

12. Venue is proper in this District because the parties contractually agreed in advance that "all legal proceedings concerning the interpretations, enforcement and defense of the transactions contemplated by this Agreement and any other Transaction Documents (whether brought against a party hereto or its respective affiliates, directors, officers, shareholders, partners, members, employees or agents) shall be commenced exclusively in the state and federal courts sitting in the City of New York."

13. Venue in this district is also proper pursuant to 15 U.S.C. § 78aa, which provides that this action may be "brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business."

14. The Court has personal jurisdiction over each of the defendants because each defendant contractually agreed in advance to "irrevocably submit[ ] to the exclusive jurisdiction of the state and federal courts sitting in the City of New York, Borough of Manhattan for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein (including with respect to the enforcement of any of the Transaction Documents)," and to "irrevocably waive[ ], and agree[ ] not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is improper or is an inconvenient venue for such proceeding."

## STATEMENT OF FACTS

### Defendants' Business Model

15.   Upon information and belief, defendants' business model involves providing financing to small cap public companies in exchange for receiving convertible notes that can be converted into ordinary shares of the target company's stock at variable discounted conversion rates.  This type of financing is known as "death spiral" financing because the continuing conversion and distribution of the target companies' shares can severely affect the price of the target companies' shares.  As explained by one district court judge:

> While conventional convertible debt arrangements permit the lender to convert the debt into a fixed number of shares, a "death spiral" financing arrangement permits the lender to convert the debt into a fixed value.  If the lender exercises her right of conversion, the stock price will almost certainly drop, because the supply of shares available for purchase in the market increases.  This, in turn, gives the lender a greater incentive to convert more shares, because it can obtain—and then sell—even more shares of the stock with the fixed value feature.

*Crown Bridge Partners, LLC v. Sunstock, Inc.*, No. 18 CIV. 7632 (CM), 2019 WL 2498370, at *1 (S.D.N.Y. June 3, 2019) (citations omitted).[2]

16.   Upon information and belief, defendants have provided financing to other public companies using agreements substantially similar to the agreements discussed herein for the purpose of unlawful trading in the shares of other publicly-traded companies.

### Defendants' Agreements with Genius

17.   Genius was formed in 2002 and is a global Edtech and education company with over 4.3 million students in over 200 countries.  Genius's corporate mission is focused on

---

[2] For a detailed discussion of death spiral convertibles and their use in unlawful schemes to manipulate the stock of publicly-traded companies, *see* John D. Finnerty, "Short Selling, Death Spiral Convertibles, and the Profitability of Stock Manipulation," (March 2005), available at https://www.sec.gov/rules/petitions/4-500/jdfinnerty050505.pdf (site visited February 23, 2023).

developing a future focused, entrepreneur education system that spans from early learning, primary, and secondary school, through to university, adult education, and corporate training.

18.  In or about July 2022, Genius was approached by defendant Ayrton, who was introduced to Genius by its investment banker.

19.  Ayrton, acting through Khatri, offered to provide Genius with up to $17 million in financing in exchange for convertible debt securities that would provide defendants with the right to convert any portion of an installment payment on the debt into shares of Genius's common stock. Genius's need for additional capital made it susceptible to agreeing to receive financing on such terms.

**The Agreements Between Genius and Alto**

20.  Defendants drafted the agreements entered into by Genius and Alto, which were presented to Genius on a take-it-or-leave it basis, without opportunity for meaningful negotiation. The agreements contain numerous one-sided provisions that are highly favorable to Alto and are designed to (1) provide Alto with windfall profits while insulating Alto from exposure to market risk; and (2) evade reporting requirements under the federal securities laws.

21.  Genius entered into a Securities Purchase Agreement with Alto (the "SPA"), dated as of August 24, 2022, pursuant to which Genius agreed to issue and sell, and Alto agreed to purchase, senior secured convertible notes in the original principal amount of $18,130,000 at an original issue discount price of $17 million. (SPA § 2.1.) The original issue discount of $1,130,000 was intended to be the consideration paid to Alto for the use of the money loaned to Genius. (*Id.*)[3]

---

[3] The SPA provides for the delivery of other transaction documents at closing (SPA §§ 2.2, 2.3) and post-closing (*id.* § 2.4).

22. On or about August 24, 2022, Genius and Alto also entered into a Registration Rights Agreement (the "RRA"), which provides for Genius to prepare and file with the SEC one or more registration statements covering all of the shares to be issued and acquired by Alto. The RRA provides for liquidated damages against Genius and 18% interest thereon in the event that Genius fails to comply with certain provisions thereof.

23. Pursuant to the SPA, on August 26, 2022, Genius issued to Alto a Senior Secured Convertible Note (the "Note"), in the original principal amount of $18,130,000, which provides for monthly installment payments and a cash payment of the outstanding value of the Note at maturity. (Note §1.) Genius has no prepayment rights under the Note. (Note § 1.)

24. The Note allows Alto, as the Holder, to convert amounts due under the Note (each a "Conversion Amount") into shares of Genius's common stock at the Conversion Price of $5.17 per share. (Note § 3.) Interest on the Note at the rate of 5% per annum commences and accrues from the date of issue and is payable by way of inclusion of the interest in the Conversion Amount of each conversion. (Note § 2[b].) The Note provides for default interest at 15% per annum after and during the continuance of any event of default. (*Id.*)

25. Alto is permitted to exercise conversions with respect to each installment payment (Note § 8), which enables Alto to convert shares incrementally while shielding the remaining balance from exposure to market movements. The Note provides Alto with the ability to further exploit market movements by deferring payment of all or any portion of an installment amount to a later installment date (Note § 8[d]) or by accelerating the payment of installment amounts (*id.* § 8[e]), provided that "with respect to any given Installment Period, the Holder may not effect aggregate Accelerations during such Installment Period in excess of an amount equal

to the sum of (1) the applicable Installment Amount for the applicable Installment Period and (2) an amount equal to 2.5x thereof."

26. The agreement contains additional price provisions that are designed to shield Alto from market risk. Section 8 of the Note provides that installment conversions "shall be converted on the applicable Installment Date at the applicable Installment Conversion Price," which is defined in Section 33(qq) of the Note as the lower of the Conversion Price or either of two calculations based on based on 90% of the volume-weighted average price ("VWAP") of Genius's shares.

27. The Note also provides Alto with a right of "Alternative Conversion" (Note § 3[f]), which is exercisable only upon certain events of default. This Alternative Conversion right allows Alto to convert any part of a Conversion Amount into shares of Genius's common stock at an "Alternate Conversion Price," which is the lowest of the adjusted Conversion Price or one of three prices that are based on 85% of the VWAP.

28. These provisions ensure that Alto will be able to profit by converting its shares at a discount below the then-current market price, regardless of whether the market price had increased or decreased since the last conversion, thereby protecting Alto's profits and insulating it from risk of downward movements in Genius's share price.

29. Alto's conversion rights under all of the foregoing provisions of the Note are expressly made subject to the limitation in Section 3(d) of the Note that Genius shall not effect any conversion, and Alto shall not have the right to convert any portion of the Note, to the extent that after giving effect to such conversion Alto and its attribution parties would beneficially own in excess of 4.99% of the outstanding shares of Genius. Section 3(d) provides, in relevant part:

8

> (d) <u>Limitations on Conversions</u>.  The Company shall not effect the conversion of any portion of this Note, and the Holder shall not have the right to convert any portion of this Note pursuant to the terms and conditions of this Note[,] and any such conversion shall be null and void and treated as if never made, to the extent that[,] after giving effect to such conversion, the Holder together with the other Attribution Parties collectively would beneficially own in excess of 4.99% (the "**Maximum Percentage**") of the Ordinary Shares outstanding immediately after giving effect to such conversion.

(Note § 3[d].)  Upon information and belief, this limitation was included in the Note by Alto to ensure that its holdings of Genius common stock would not exceed the 5% threshold that would require Alto to publicly disclose its holdings by filing Schedule 13D with the SEC.  See 22 C.F.R. § 240.13d-1.[4]  Indeed, Section 3(d) of the Note further provides that "the Ordinary Shares issuable pursuant to the terms of this Note in excess of the Maximum Percentage shall not be deemed to be beneficially owned by the Holder for any purpose including for purposes of Section 13(d) or Rule 16a-1(a)(1) of the Exchange Act."

30.   Conspicuous by its absence from any of the transactions documents is any contractual provision that establishes Alto's right or Genius's obligation to hold conversion notices escrow to be effect at a later date.

**To Date, Alto Has Served Notices Demanding Conversion of More Than 49 Million Shares of GNS**

31.   In the months prior to the execution of the agreements between Genius and Alto, shares of GNS traded between $3.82 and $10.68 per share, and closed at $7.75 on August 19, 2022, the last trading date prior to execution of the agreements.

---

[4] "Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is specified in paragraph (i) of this section, is directly or indirectly the beneficial owner of more than five percent of the class shall, within 10 days after the acquisition, file with the Commission, a statement containing the information required by Schedule 13D (§ 240.13d-101)."

32. Almost immediately after execution of the agreements with Alto, shares of GNS began to decline precipitously, falling to below 32 cents per share by mid-December 2022. Upon information and belief, this decline of almost 96% was the result of market manipulation by parties who had an incentive to drive down Genius's share price.

33. Defendants sought to exploit these market conditions by exercising conversions at the bottom of the market, thereby maximizing the number of newly-issued shares of GNS Alto would receive. Although the first installment payment of $668,274.29 on the Note was not due until November 25, 2022, at or about the end of October 2022, Ayrton requested that Alto be allowed to make early conversions of this first installment payment to take advantage of favorable market conditions. Genius agreed to this request.

34. Between October 28, 2022 and December 16, 2022 (the day that GNS shares declined to their historical low point of less than 32 cents per share), Ayrton submitted 11 conversion notices reflecting principal and interest payments in the aggregate amount of $707,305.73 (the "2022 Conversions"). The aggregate principal amount of these conversions was $472,160.00, and left a principal balance of $196,114.29 that could be deferred to a later installment.

35. The 2022 conversion notices applied increasingly lower conversion rates ranging from $1.29 per share to a low of $0.29 per share, far below the $5.17 Conversion Price stated in the Note. As a result, the aggregate number of conversion shares issued to Alto as a result of the 2022 Conversion Notices was more than 1.5 million shares.

36. After giving effect to the 2022 Conversions, Alto held just below 4.2% of Genius's outstanding shares. Upon information and belief, Alto distributed some of the shares it received as a result of the 2022 Conversion, but further conversions were likely to exceed the

4.99% Maximum Percentage in Section 3(d) of the Note, such that Alto would have no right to effect conversions that would exceed the Maximum Percentage.

37. Notwithstanding this limitation, on January 31, 2023, Ayrton purported to submit three additional conversion notices to Genius, each at a conversion price of just $0.2856 per share. These notices improperly calculated the principal balance that could have been deferred following the 2022 Conversions and further sought to accelerate installments. The January 31, 2023 conversion notices collectively demanded that Genius issue an additional 3,975,006 shares to Alto.

38. Alto recognized that giving effect to these conversion notices would cause Alto, together with its attribution parties, to beneficially own far in excess of 4.99% of GNS's outstanding shares immediately after giving effect to such conversions, in excess of the Maximum Percentage, and would trigger reporting requirements under Section 13 of the Exchange Act.

39. In an effort to evade this contractual limitation and avoid regulatory scrutiny of their predatory lending practices, Alto's January 31, 2023 conversion notices demanded that the second and third of these three conversion notices be held "in escrow pending Ayrton's confirmation of compliance with the 4.99% blocker set forth in Section 3(d) of the Note only after the Company satisfies" the prior conversion notices. Upon information and belief, defendants made this demand in an attempt to lock in the historically low price of GNS for application to future conversions, at a time when they could not accept delivery of the newly-issued shares, while simultaneously avoiding any disclosure to the public of the number of newly-issued shares being made available to Alto.

40. There is, however, no provision of the Note or other transaction documents which allows or provides for conversion notices to be held in escrow. Rather, as noted, Section 3(d) of the Note plainly states that Genius shall not effect any conversion – and Alto shall not have the right to convert any portion of the Note – to the extent that after giving effect to such conversion Alto and its attribution parties would beneficially own in excess of 4.99% of the outstanding shares of Genius. Accordingly, the Court should declare that Genius has no obligation to honor the second and third conversion notices it received from defendants on January 31, 2023, or any of the conversion notices received from defendants after that date.

41. On February 1, 2023, Genius advised Ayrton that, according to Genius's calculations, Alto was already over the amount of shares it could convert.

42. Undeterred, on February 8, 2023, defendants delivered five more conversion notices, each at a conversion price of $0.3173, demanding an aggregate total of 8,156,251 additional shares. Like the second and third conversion notices sent on January 31, 2023, each of these five notices improperly demands that Genius "hold this conversion notice in escrow pending Ayrton's confirmation of compliance with the 4.99% blocker set forth in Section 3(d) of the Note" and until Genius has satisfied all prior conversion notices. On the same date, Ayrton sent an e-mail stating that "[w]e also delivered two additional Conversion Notices on January 31, 2023, which were to be held in abeyance by [by Genius] until such time that the Ordinary Shares could be issued in compliance with the Section 3(d) of the Note. [Genius] has failed to acknowledge these Conversion Notices."

43. Just five days later, on February 13, 2023, Ayrton delivered ***twenty-one*** additional conversion notices, which provided for the issuance of for an additional ***35,695,574*** shares, and again demanded, improperly, that Genius hold these conversion notices in escrow.

44. Since October 28, 2022, defendants have delivered a total of 40 conversion notices – 28 of which it has asked to be held in escrow – that would allow Alto to effectively receive more than 49 million newly-issued shares of Genius at conversion prices below $0.50 per share, even though Genius's share price has recovered and is now trading in the range of $5 to $7 per share. Upon information and belief, Alto intends to distribute these shares into the public market so that it can profit solely from its acquisition of these shares at a steep discount, rather than from any appreciation in the market price of Genius's stock. Upon information and belief ,and subject to changes in market price, Alto's profits upon sale of these shares would be at least $200 million.

**The Note and Other Agreements Are Part of an Unlawful Scheme to Violate Sections 10(b), 13, 15, 16, and 20 of the Exchange Act and Rule 10b-5**

45. The agreements with Genius described above are part and parcel of an unlawful scheme by defendants to circumvent their obligation to register as dealers as required by Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)],[5] in order to conceal their intention to trade on non-public information in violation of Section 10 of the Exchange Act and Rule 10b-5, specifically by not reporting their ability and intention to flood the market with as many as 48 millions shares of GNS, which will have a material adverse effect on the market value of Genius and the holdings of Genius's other stockholders. This information is not publicly known because defendants are structuring their transactions, by demanding that conversion notices be held in escrow, to evade the reporting requirements of Section 13 of the Exchange Act [15 U.S.C. § 78m].

---

[5] Section 15(a)(1) of the Exchange Act provides that "[i]t shall be unlawful for any broker or dealer … to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with subsection (b) of this section."

46. Indeed, the SEC has brought multiple actions asserting violations of Section 15(a) against entities and individuals who have engaged in acts that are indistinguishable from those committed by defendants here. *See, e.g., Securities and Exchange Commission v. Keener*, Civ. No. 20-cv-21254 (S.D. Fla.); *Securities and Exchange Commission v. Crown Bridge Partners, LLC, et al.*, Civ. No. 22-cv-6537 (S.D.N.Y.); *Securities and Exchange Commission v. John D. Fierro and JDF Capital, Inc.*, Civ. No. 20-cv-2014 (D.N.J.). In each of these cases, the defendants provided financing to publicly traded companies in exchange for convertible securities that enabled them to acquire millions of newly-issued, unrestricted shares of the target companies' stock at a discount and then profit by the distribution of those shares into the public markets, in circumstances that have all the common attributes of a securities dealer, including (a) limited exposure to market risk, (b) the sale of large numbers of newly-issued shares into the market; (c) acquiring stock at a discount and profiting by selling at a spread or markup, (d) obtaining shares for sale through newly issued shares rather than purchases on the secondary market, and (e) significantly increasing the amount of shares trading publicly and the company's unrestricted share totals. The defendants in these actions were alleged to have received millions of dollars in profits, as opposed to the hundreds of millions of dollars that Alto stands to gain here.

47. Moreover, defendants have attempt to structure their stock conversion transactions so as to avoid the reporting requirements under Section 13 of the Exchange Act. By exercising conversions based on market prices in late 2022 and early 2023, while demanding that those conversions be held "in escrow" until such time as Alto is able to sell them into the public markets without regulatory scrutiny, defendants are attempting to conceal the fact that Alto is effectively gaining access to more than 49 million newly-issued shares of GNS for distribution.

48. By keeping secret and failing to report the fact that Alto has already purported to convert and gain access to over 48 million shares of GNS, and intends to distribute those shares into the public market, defendants are trading on material, non-public information in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

49. Accordingly, the SPA, Note, and other transaction documents are void pursuant to Section 29(b) of the Exchange Act.  Section 29(b) provides in relevant part that:

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract

[15 U.S.C. § 78cc(b)].

## AS AND FOR A FIRST CLAIM FOR RELIEF
### (Rescission – Exchange Act § 29[b])

50. Genius repeats and realleges each and every allegation contained paragraphs 1 through 49 of this Complaint as if set forth at length herein.

51. Genius and Alto are parties to the SPA, Note, RRA, and other transaction documents.

52. The SPA, Note, RRA, and other transaction documents are part and parcel of an unlawful scheme by defendants to act as unregistered dealers in violation of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)], to evade reporting requirements under Sections 13 and 16 of the Exchange Act, and to violate Section 10(b) of the Exchange and Rule 10b-5. Defendant Khatri is subject to liability for these violations as a control person under Section 20 of the Exchange Act.

53. Accordingly, this Court should declare that the SPA, Note, RRA, and other transaction documents are void and unenforceable as against Genius and order rescission of those agreements pursuant to Section 29(b) of the Exchange Act (15 U.S.C. § 78cc[b]).

### AS AND FOR A SECOND CLAIM FOR RELIEF
### (Declaratory Judgment)

54. Genius repeats and realleges each and every allegation contained paragraphs 1 through 49 of this Complaint as if set forth at length herein.

55. Genius and Alto are parties to the SPA, Note, RRA, and other transaction documents.

56. Section 3(d) of the Note provides that:

> [Genius] shall not effect the conversion of any portion of this Note, and [Alto] shall not have the right to convert any portion of this Note pursuant to the terms and conditions of this Note[,] and any such conversion shall be null and void and treated as if never made, to the extent that[,] after giving effect to such conversion, [Alto] together with the other Attribution Parties collectively would beneficially own in excess of 4.99% (the "**Maximum Percentage**") of the Ordinary Shares outstanding immediately after giving effect to such conversion.

No provision of the Note or other transaction documents allows or provides for conversion notices to be delivered and held in escrow, or requires Genius to honor a demand to hold any conversion notice in escrow for conversion at a later time.

57. There now exists an actual controversy among the parties as to (a) whether defendants are permitted to deliver conversion notices to Genius, at a conversion price stated therein, to be held in escrow for conversion at the stated conversion price at a later time; (b) whether Genius has any obligation to honor such conversion notices and hold them in escrow as demanded by defendants; and/or (c) whether such notices are null and void as provided in Section 3(d).

58. In a case of actual controversy within its jurisdiction, the Court may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

59. Accordingly, the Court should determine the rights and obligations of the parties and declare that: (a) defendants have no right to deliver conversion notices to Genius, at a conversion price stated therein, to be held in escrow for conversion at the stated conversion price at a later time; (b) Genius has no obligation to honor the second and third conversion notices it received from defendants on January 31, 2023, or any of the conversion notices received from defendants after that date, and (c) that all such conversions notices are null, void, and of no legal effect.

## **DEMAND FOR RELIEF**

WHEREFORE, plaintiff demands judgment in favor of plaintiff and against defendants:

A. On its first claim for relief, declaring that the SPA, Note, RRA, and other transaction documents are void and unenforceable as against Genius and ordering rescission of those agreements pursuant to Section 29(b) of the Exchange Act (15 U.S.C. § 78cc[b]);

B. On its second claim for relief, if the SPA, Note, RRA, and other transaction documents are not declared void and unenforceable and rescinded in their entirety, declaring that: (1) defendants have no right to deliver conversion notices to Genius, at a conversion price stated therein, to be held in escrow for conversion at the stated conversion price at a later time; (2) Genius has no obligation to honor the second and third conversion notices it received from defendants on January 31, 2023, or any of the conversion notices received from

defendants after that date, and (3) that all such conversions notices are null, void, and of no legal effect; and

    C. Granting plaintiff such other or further relief as the Court may deem just and proper.

Dated: New York, New York
    February 27, 2023

              **WARSHAW BURSTEIN, LLP**

              */s/ Alan M. Pollack*
              Alan M. Pollack
              575 Lexington Avenue, 7th Floor
              New York, New York 10022
              (212) 984-7700

              and

              **CHRISTIAN LEVINE LAW GROUP, LLC**

              */s/ James Wes Christian*
              James Wes Christian
              2302 Fannin, Suite 205
              Houston, Texas 77002
              (713) 659-7617

              Attorneys for Plaintiff